# United States Court of Appeals
## For the First Circuit

No. 19-1613

UNITED STATES OF AMERICA,

Appellee,

v.

JEROME CAPELTON,
a/k/a ANTHONY COLEMAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Barron, Circuit Judges.

Samia Hossain, Federal Public Defender Office, on brief for
appellant.
Donald C. Lockhart, Assistant United States Attorney, and
Andrew E. Lelling, United States Attorney, on brief for appellee.

July 16, 2020

**TORRUELLA**, **Circuit Judge**.    Defendant-Appellant Jerome Capelton ("Capelton") challenges the district court's determination on resentencing pursuant to the 2018 First Step Act that he is a career offender under section 4B1.1 of the U.S. Sentencing Guidelines (the "Guidelines").    In classifying Capelton as a career offender, the court relied on two Massachusetts drug convictions from 1992 and 1996, which Capelton claims do not qualify as predicate "controlled substance offense[s]" under the career-offender guideline.    He argues that the convictions implicitly include aiding and abetting liability under Massachusetts law -- then called "joint venture"[1] -- which is broader in scope than generic aiding and abetting liability and, consequently, there cannot be a categorical match between the convictions and the definition of "controlled substance offense."    According to Capelton, at the time of his Massachusetts convictions, a defendant could be convicted under the relevant Massachusetts drug statute on a theory of joint venture by proving knowledge of the crime alone, rather than by proving shared intent with the principal to promote or facilitate the crime, as would be required to be convicted as an aider and abettor of a generic

---

[1]  Massachusetts's "joint venture" theory of liability "finds its roots in the concept of accessorial or accomplice liability." Commonwealth v. Zanetti, 910 N.E.2d 869, 879 (Mass. 2009).

"controlled substance offense." Because Capelton failed to establish that the scope of joint venture liability under Massachusetts law is any broader than under the generic standard, we find no error in the district court's determination of his career-offender status and affirm the sentence.

## I. Background

On September 26, 2001, a jury convicted Capelton of one count of conspiracy to possess with intent to distribute at least fifty grams of cocaine base, in violation of 21 U.S.C. § 846, and three counts of distribution and possession with intent to distribute at least fifty grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1). The presentence investigation report ("PSR") issued after Capelton's conviction indicated that the Guidelines' career-offender provisions, U.S.S.G. § 4B1.1, were applicable because Capelton was over the age of eighteen, the instant offenses involved a controlled substance violation, and Capelton had several Massachusetts state felony convictions, at least two of which were for either a crime of violence or a crime involving an applicable controlled substance violation.[2] With the

---

[2] Section 4B1.1(a) of the Guidelines provides that a defendant qualifies as a career offender if

> (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a

-3-

career-offender guideline governing, Capelton's total offense level was thirty-seven[3] and his criminal history category was VI, which yielded a guideline sentencing range ("GSR") of 360 months' to life imprisonment.

The district court adopted the PSR's recommendations, and after denying Capelton's request for a downward departure,[4] it imposed sentences of 360 months of imprisonment followed by a five-year term of supervised release on each count, to be served concurrently. On direct appeal, Capelton raised several trial errors and challenged the district court's sentencing determination denying his request for a downward departure from the Guidelines. See United States v. Capelton, 350 F.3d 231 (1st Cir. 2003). We affirmed his conviction and sentence. See id. at 235. Subsequently, Capelton attempted to collaterally attack his conviction and sentence on several occasions without success.[5] See

---

controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

[3] The PSR did not apply any other adjustments.

[4] Capelton grounded his request for a downward variance on sections 4A1.3 (Departures Based on Inadequacy of Criminal History Category) and 5H1.6 (Family Ties and Responsibilities) of the Guidelines.

[5] Some of Capelton's petitions included a challenge to his career-offender designation, albeit on grounds different than the one presented in his argument now before us. See Capelton v. United States, No. 15-cv-312-JL, 2016 WL 3102200, at *1 (D.N.H.

Capelton v. United States, No. 15-cv-312-JL, 2016 WL 3102200, at *1 (D.N.H. Jan. 5, 2016).

In August 2010, the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372, was signed into law.  As it pertains to this appeal, the statute amended the Controlled Substances Act, 21 U.S.C. § 841(b)(1), by raising the quantity of crack cocaine necessary to trigger both the ten-year statutory-minimum sentence and statutory-maximum penalty of life imprisonment from fifty to 280 grams.  See 21 U.S.C. § 841(b); Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 2, 124 Stat. 2372, 2372.  These amendments applied only to defendants who were sentenced on or after the Fair Sentencing Act's effective date of August 3, 2010.  See Dorsey v. United States, 567 U.S. 260, 264 (2012).  However, in December 2018, the First Step Act was enacted into law, allowing certain defendants, like Capelton, who were convicted for crack cocaine offenses under 21 U.S.C. § 841 prior to the enactment of the Fair Sentencing Act, to seek a retroactive sentencing reduction.  See First Step Act of 2018, Pub. L. No. 115-391, § 404, 132 Stat. 5194, 5222.

In light of the First Step Act, on March 6, 2019, the United States Probation Office ("Probation") issued a memorandum

Jan. 5, 2016).

-5-

supplementing the PSR it had initially prepared for Capelton's sentencing back in 2002. The memorandum explained that Capelton still qualified as a career offender based on two prior Massachusetts drug convictions: a 1992 conviction for possession of a class B substance with intent to distribute, in violation of Mass. Gen. Laws ch. 94C, § 32A(a), and a 1996 conviction for distribution of a class B substance, in violation of Mass. Gen. Laws ch. 94C, § 32A(b). However, because the statutory maximum term of imprisonment was reduced to forty years from life, Capelton's corresponding offense level was now thirty-four (down from thirty-seven). According to the memorandum, with the career-offender enhancement, Capelton's GSR was 262 to 327 months of imprisonment, and without it, his GSR was 168 to 210 months of imprisonment. Under either scenario, Capelton faced a supervised release term of a minimum of four years.

Capelton sought relief under the First Step Act on March 20, 2019. He requested to be resentenced under section 404(b) of that Act and without the application of the career-offender enhancement. Specifically, Capelton objected to his continued designation as a career offender, arguing that the two Massachusetts drug offenses identified in Probation's memorandum did not qualify as predicate "controlled substance offense[s]" under U.S.S.G. § 4B1.1 because, at the time of the

-6-

offenses, generic aiding and abetting liability required proof of an element -- shared intent -- that joint venture liability under Massachusetts state law did not, which rendered the Massachusetts offenses categorically overbroad. Because Capelton had already served nearly nineteen years in prison, he requested a sentence of time served. On the other hand, the Government recommended that Capelton receive a sentence at the high end of the updated career-offender GSR.

The district court held a resentencing hearing on June 5, 2019. First, it acknowledged that Capelton's eligibility for a reduced sentence following the passage of the First Step Act was undisputed. It then turned to Capelton's career-offender status. Capelton expanded on the argument presented in his motion for relief, which he now also presses on appeal: that, under Massachusetts law prior to the 2009 opinion of the Supreme Judicial Court ("SJC") in Commonwealth v. Zanetti, 910 N.E.2d 869 (Mass. 2009), a person could be found guilty of aiding and abetting a drug crime without necessarily having an intent to participate in the crime if the person was present with knowledge that the crime was being committed and willing to assist in the commission of the crime. According to Capelton, because the generic controlled substances offenses contemplated by the career-offender guideline required that a person have the intent to commit the crime, his

-7-

Massachusetts state offenses were broader in scope and therefore a categorical mismatch with the guideline.

The district court questioned Capelton's argument because it had difficulty understanding "how someone can participate in possession of a drug with intent to distribute without having any intent to participate in a crime involving an intent to distribute." Ultimately, it rejected his theory as "imaginative but unsound," concluding that there was no "realistic probability that any jury would find an individual guilty of either of [the two Massachusetts drug crimes for which Capelton was convicted, even as an aider and abettor,] without finding beyond a reasonable doubt that there [wa]s an intent to commit that crime." Upholding Capelton's designation as a career offender, the court adopted a GSR of 262 to 327 months of imprisonment. It then granted a ten-month downward variance from the low end of the GSR based on Capelton's "very difficult upbringing" and the family support shown towards him. Accordingly, the court imposed a revised sentence of 252 months of imprisonment and four years of supervised release. Capelton then filed this appeal.[6]

---

[6] Since filing the notice of appeal, Capelton was released from prison in December 2019 and began his term of supervised release. However, his supervised release was revoked two months later on February 12, 2020, because he violated three conditions of his term of supervision. Consequently, the court sentenced him to three months of imprisonment to be followed by forty-five months of supervised release. On April 10, 2020, due to the COVID-19

## II. **Discussion**

On appeal, Capelton disputes that his 1992 and 1996 Massachusetts convictions qualify as predicate "controlled substance offense[s]" under U.S.S.G. § 4B1.2(b) for career offender purposes. Specifically, Capelton avers that we should apply the "categorical approach" in analyzing whether his Massachusetts offenses fall within the career-offender guideline because, at the time of those offenses, aiding and abetting liability was indivisible from the Massachusetts substantive offenses -- i.e., Massachusetts law did not require a specific finding by the jury that it was convicting a defendant as a principal or as a joint venturer. He further contends that in 1992 and 1996, Massachusetts joint venture liability was broader than generic aiding and abetting liability and therefore the Massachusetts offenses were not categorically "controlled substance offense[s]." According to Capelton, when he was convicted in 1992 and 1996, Massachusetts could convict a defendant on a joint venture theory simply by proving a mens rea of knowledge that another participant intended to commit a crime, rather than

---

pandemic and the short time remaining before Capelton's release, the court modified his sentence to time-served, ordered his release to home confinement, and amended the supervised release portion of the judgment to substitute a five-month period of home confinement in place of residential re-entry, but the other conditions of supervised release remained untouched.

-9-

a mens rea of specific intent to promote or facilitate the crime, as generic aiding and abetting requires. Consequently, Capelton reasons that Massachusetts joint venture liability criminalized more conduct than generic aiding and abetting liability and, thus, his prior convictions were overbroad and cannot serve as predicates for career offender purposes.

In response, the Government disputes that Massachusetts joint venture liability is broader in scope than generic aiding and abetting liability, arguing that Capelton misinterprets Massachusetts case law, which does require proof of shared intent in order to convict on a joint venture theory and thus does not allow a conviction based on mere knowledge. The Government also contends that we must uphold Capelton's conviction because, first, he waived his challenge during the 2019 resentencing by endorsing the sentence, and second, any error was harmless because Capelton has already completed his term of imprisonment, and his term of supervised release is mandated by statute.[7]

We need not resolve whether Capelton waived his sentencing challenge because as we will explain, we reject his

---

[7] The Government also suggests (in a footnote) that the district court was not authorized under the First Step Act to revisit Capelton's career-offender determination at resentencing, but we do not resolve this "antecedent statutory authority question here," nor does the Government ask us to, for we find other grounds to affirm Capelton's sentence.

claim on the merits.  See United States v. Llanos-Falero, 847 F.3d 29, 33 n.2 (1st Cir. 2017) (opting to bypass an appellate-waiver argument to address the merits instead because the issues raised by the appellant all failed); Yeboah-Sefah v. Ficco, 556 F.3d 53, 68 n.6 (1st Cir. 2009) (withholding resolution of a waiver dispute because the petitioner's claim could be "easily reject[ed]" on the merits).  We hold that Capelton's Massachusetts convictions qualify as "controlled substance offense[s]" and therefore constitute valid predicate offenses under the relevant provision of the career-offender guideline.

**A.**

We review whether a prior conviction qualifies as a predicate offense under section 4B1.1 de novo.  United States v. Mohamed, 920 F.3d 94, 99 (1st Cir. 2019) (quoting United States v. Davis, 873 F.3d 343, 345 (1st Cir. 2017); United States v. Almenas, 553 F.3d 27, 31 (1st Cir. 2009).  To qualify as a career offender, a defendant must have, among other requirements, "at least two prior felony convictions of either a crime of violence or a controlled substance offense."  U.S.S.G. § 4B1.1(a).  Capelton concedes that he has two prior felony convictions but disputes that they satisfy the Guidelines' definition of "controlled

-11-

substance offense." For purposes of the career-offender guideline, a "controlled substance offense" is defined as

> an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

Id. § 4B1.2(b). The Guidelines' application note 1 to § 4B1.2 specifies that the offense of aiding and abetting is included in the definition of "controlled substance offense." Id. § 4B1.2 cmt. n.1; see also United States v. Benítez-Beltrán, 892 F.3d 462, 467 n.4 (1st Cir. 2018); cf. United States v. Lewis, No. 18-1916, 2020 WL 3249058, at *8 (1st Cir. June 16, 2020) (Torruella, J., and Thompson, J., concurring) (expressing "discomfort with the practical effect of the deference to Application Note 1" regarding inchoate offenses).

We apply the "categorical approach" set forth by the Supreme Court in Taylor v. United States, 495 U.S. 575 (1990), to determine whether a prior offense qualifies as a "controlled substance offense" under section 4B1.1. United States v. García-Cartagena, 953 F.3d 14, 18 (1st Cir. 2020); see also Benítez-Beltrán, 892 F.3d at 466 ("We use a 'categorical approach' to determine whether the offense for which a defendant was previously convicted matches an expressly enumerated offense under

-12-

§ 4B1.2(a)." (citing United States v. Castro-Vázquez, 802 F.3d 28, 35 (1st Cir. 2015))).  Under this approach, we look only to the elements of the offense, not to "'how a given defendant actually perpetrated the crime,' to decide if the offense, as defined in the statute, matches § 4B1.2's criteria" for a "controlled substance offense."  García-Cartagena, 953 F.3d at 18 (quoting Mathis v. United States, 136 S. Ct. 2243, 2248, 2251-52 (2016)); see also Benítez-Beltrán, 892 F.3d at 466 ("[A] prior conviction qualifies as one for a ['controlled substance offense'] so long as the elements of the prior offense encompass no more conduct than do the elements of the 'generic' version of an offense that the guideline expressly enumerates." (citing Castro-Vázquez, 802 F.3d at 35)).

**B.**

Based on an application of the categorical approach, Capelton argues that the Massachusetts joint venture liability standard in 1992 and 1996 (the years of his purported predicate felony convictions) encompassed more conduct than the generic definition of aiding and abetting, resulting in a categorical mismatch.  Capelton's argument relies on the following analytical steps: (1) that aiding and abetting liability is implicit in every Massachusetts criminal charge; (2) that the categorical approach requires that we consider, in looking to the minimum conduct

criminalized by a statute, the scope of aiding and abetting liability; and (3) that the principal and accomplice theories of guilt are indivisible from the substantive offense.  We neither accept nor reject any of those premises because, as the Government proposes in its brief, we assume without deciding that they are true; after all, the Government does not address them, and the parties' dispute hinges on a comparison of the mens rea required to prove joint venture liability in Massachusetts and generic aiding and abetting liability at the time of Capelton's purported predicate offenses in 1992 and 1996.

The parties generally agree that generic aiding and abetting liability requires a shared intent with the principal and that knowledge alone is insufficient to meet the mens rea requirement.[8]  Therefore, for purposes of this appeal, we assume

_____

[8] Capelton adopts the generic aiding and abetting liability standard from the Ninth Circuit decision in United States v. Franklin, 904 F.3d 793, 799 (9th Cir. 2018), abrogated on other grounds by Shular v. United States, 140 S. Ct. 779 (2020).  On the other hand, the Government relies primarily on Rosemond v. United States, 572 U.S. 65, 70-71 (2014), which sets forth the federal aiding and abetting liability standard (not necessarily the generic one).  But both approaches require shared intent.  Compare Franklin, 904 F.3d at 799 ("[G]eneral principles of accomplice liability establish that '[a] person is an "accomplice" of another in committing a crime if, with the intent to promote or facilitate the commission of the crime,' he commits certain acts; 'a person's . . . knowledge that a crime is being committed or is about to be committed, without more, does not make him an accomplice.'" (second and third alterations in original) (quoting 1 Wharton's Criminal Law § 38 (15th ed.))), with Rosemond, 572 U.S. at 71 ("[A] person is liable under [the federal aiding and

-14-

that the generic aiding and abetting liability standard proposed by the parties is correct. See United States v. Boleyn, 929 F.3d 932, 940 (8th Cir. 2019) (adopting this approach), cert. denied, 140 S. Ct. 1138 (2020). The narrower issue before us, then, is to determine the mens rea that was required to prove joint venture liability in Massachusetts in 1992 and 1996. Capelton argues that only "mere knowledge" was required, while the Government contends that Massachusetts law required more than that because shared intent had to be shown.

We side with the Government. We have been warned that in applying the categorical approach, the "focus on the minimum conduct criminalized by the state statute is not an invitation to apply 'legal imagination' to the state offense; there must be 'a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime.'" Moncrieffe v. Holder, 569 U.S. 184, 191 (2013) (quoting Gonzáles v. Dueñas-Álvarez, 549 U.S. 183, 193 (2007)). As we explain next, Capelton has not persuaded us that, at the time of his Massachusetts convictions in 1992 and 1996, Massachusetts applied its aiding and abetting liability

---

abetting statute, 18 U.S.C. § 2,] if (and only if) he (1) takes an affirmative act in furtherance of th[e] offense, (2) with the intent of facilitating the offense's commission.").

-15-

standard to encompass more conduct than the generic form of that standard. Put another way, Capelton has not shown that a jury in Massachusetts could convict a defendant on a joint venture theory of guilt without finding that the defendant had a shared intent with the principal to commit the crime. Accordingly, we reject Capelton's contention that his prior convictions are overbroad.

## c.

In 1979, the SJC articulated the theory of joint venture liability in Commonwealth v. Soares, stating that to convict a defendant on such theory, the prosecution had to show that the defendant shared the intent required for the underlying crime with the principal. See 387 N.E.2d 499, 506 (Mass. 1979) ("The theory underlying joint enterprise is that one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal."). Four years later, in Commonwealth v. Bianco, the SJC articulated the Soares joint venture liability standard as a three-part test, recognizing joint venture liability when a defendant was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." 446 N.E.2d 1041, 1047

(Mass. 1983) (citing Commonwealth v. Casale, 408 N.E.2d 841 (Mass. 1980), and Soares, 387 N.E.2d at 499).

The Bianco three-part test was the standard in place at the time of Capelton's Massachusetts convictions. Capelton argues that the SJC's use of the conjunctive word "or" in the second prong of the Bianco test suggests that knowledge and intent were separate elements of joint venture liability and, thus, a defendant could be convicted under that theory "upon proof of mere knowledge that another intended to commit the crime, without proof of specific intent to commit the crime."

The Government persuasively argues that Capelton erroneously isolates the second prong of the test when, in context, the three prongs read together "plainly require intent." In support, the Government explains that "[o]ne who is actually present at the scene of an impending crime, and who has knowledge that the principal intends to commit the crime, and who even has a prior 'agreement' with the principal that he is 'willing and available to help' . . . shares the intent of the principal." In response, Capelton argues that only the second prong of the test concerns the mens rea requirement, and that if the Government's reasoning were correct, the "with intent to commit a crime" clause of the second prong would be superfluous.

It is hard to imagine a situation relevant to the drug crimes at issue here (possession with intent to distribute and distribution of a controlled substance) in which the combination of the second prong -- "knowledge that another intends to commit the crime" -- with the third prong -- the "agreement [to be] willing and available to help the other [commit the crime] if necessary" -- does not amount to having a shared intent with the principal "to promote or facilitate the commission of the crime," as the parties agree generic aiding and abetting requires. And while Capelton proposes that Bianco "did not include the shared mental state language" from Soares, the SJC in Bianco rejected the argument that the defendants in that case could be convicted on a joint enterprise theory "because there was insufficient evidence that they shared the mental state required of joint venturers," and cited Soares to support this conclusion. See Bianco, 446 N.E.2d at 1045 (emphasis added).

Capelton makes much of the post-Bianco case Zanetti, 910 N.E.2d 869, arguing that it changed the joint venture standard articulated in Bianco by implementing a heightened mens rea requirement of shared intent. According to Capelton, Soares's shared mental state requirement that the SJC had eliminated in Bianco in 1983 was not reintroduced until 2009 in Zanetti. However, a close reading of Zanetti instead supports the

-18-

Government's contention that, in 1992 and 1996, the Massachusetts joint venture theory of liability required a showing of shared intent.

In Zanetti, the SJC implemented procedural reforms to the jury instructions in an attempt to clarify the law on joint venture.  910 N.E.2d at 871, 883.  It recognized that Bianco's definition of joint venture liability "ha[d] proven to be a source of confusion to jurors and judges." Id. at 880-81.  The confusion arose from an outdated and "false distinction between a principal and an accomplice" (or joint venturer) created by the language in the model jury instructions.  Id. at 881.  The SJC explained that at the time, the model jury instructions "encourage[d] judges to instruct on the required elements of the charged offense, and then separately instruct on joint venture liability, identifying the three familiar elements [of the Bianco test]."  Id. at 882.  Seeking to eliminate "the confusion and complexity" created by the separate narration of the elements in the instructions, the SJC reformulated the standard for joint venture liability by requiring that the jury be instructed simply that "the defendant is guilty if the Commonwealth has proved beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense."  Id. at 883 (emphasis added).

-19-

Contrary to Capelton's contention, there is no indication in Zanetti that the SJC thought that Bianco had eliminated the shared intent requirement from Soares, which it then had to reintroduce in Zanetti as a requirement to prove joint venture liability. Rather, it appears to us that the SJC was concerned that, with the instructions for principal liability being separated from the instructions for joint venture liability, the jury would not understand that, "to find the defendant guilty as a joint venturer, [it] must find that the Commonwealth ha[d] proved both the elements of the offense and the defendant's knowing participation in the offense." Id. at 882. The SJC also expressed concern that, in cases where a lesser crime escalates into a more serious crime, the severed jury instructions could confuse the jury about whether a defendant needed to share the intent of the principal in the initial crime and/or in the subsequent one. Id. at 882 n.20.

Furthermore, the SJC expressly stated that the reformulated joint venture standard was "hardly novel" and that "it best reflect[ed] the spirit behind the common law as . . . reflected in the aiding and abetting statute, which declares the aider and abettor to be as culpable as the chief perpetrator of the offense." Id. at 883 (citation omitted); see Mass. Gen. Laws ch. 274, § 2. The SJC recognized that, "[a]t its core, joint

-20-

venture criminal liability has two essential elements: that the defendant knowingly participated in the commission of the crime charged, and that the defendant had or shared the required criminal intent." Zanetti, 910 N.E.2d at 883. Thus, the SJC expressed that it was merely "[s]treamlining the [jury] instruction" for accomplice liability, id., "hop[ing] to provide clearer guidance to jurors and diminish the risk of juror confusion in cases where two or more persons may have committed criminal acts," id. at 884. The shift in language, the SJC clarified, "d[id] not enlarge or diminish the scope of existing joint venture liability." Id.

In our view, the series of cases decided between Bianco and Zanetti to which both Capelton and the Government cite also tend to support the Government's position that the Commonwealth had to prove shared intent in the wake of Bianco. See, e.g., Commonwealth v. Clemente, 893 N.E.2d 19, 51 (Mass. 2008) (concluding that a joint venturer "must share the mental state of the principal," and jury instructions that quoted the Bianco test verbatim, "considered as a whole, explained that concept to the jury"); Commonwealth v. Cannon, 869 N.E.2d 594, 600 (Mass. 2007) (upholding jury instruction requiring proof of shared intent to be convicted of the crime as a joint venturer); Commonwealth v. Hernández, 790 N.E.2d 1083, 1087-88 (Mass. 2003) ("Under the joint venture theory, for a trafficking conviction, the defendant need

-21-

not have possessed the drugs, actually or constructively. He need only have shared the intent of the principal to distribute." (citations omitted)); Commonwealth v. Blake, 696 N.E.2d 929, 934 (Mass. 1998) (affirming conviction under a joint venture theory of liability where sufficient evidence supported an inference that the defendant "and the other shooters shared the intent to aid each other and to engage in a shooting spree"); Commonwealth v. Brooks, 664 N.E.2d 801, 804-05 (Mass. 1996) (reciting the Bianco three-factor test, while requiring that defendant share the shooters' intent to be convicted as a joint venturer); Commonwealth v. Semedo, 665 N.E.2d 638, 641 (Mass. 1996) (noting that, to sustain a conviction for joint venture, in addition to "knowledge that another intended to commit a crime," the Commonwealth had to show "that the defendant shared with the principal the mental state required for the crime"); Commonwealth v. Cunningham, 543 N.E.2d 12, 20 (Mass. 1989) ("To sustain a conviction based on a joint venture, the Commonwealth need only show that each defendant shared the mental state required for the crime of which he was convicted, and that he satisfied the other elements of the test for joint venture.").

This leads us to conclude that Massachusetts required a showing of shared intent to convict a defendant on a theory of joint venture pre- and post-Zanetti, and importantly to this

appeal, during the time period Capelton was convicted of his drug offenses in Massachusetts. Thus, Capelton has not shown, as required by Moncrieffe, that there is "a realistic probability" that Massachusetts would have applied its drug statute at issue here to conduct that fell outside the generic definition of aiding and abetting, namely, where the joint venturer lacked the requisite intent to distribute. See Moncrieffe, 569 U.S. at 191 (quoting Dueñas-Álvarez, 549 U.S. at 193). Accordingly, we reject Capelton's contention that his two prior state convictions are overbroad and do not qualify as "controlled substance offense[s]," and we hold that the district court correctly sentenced Capelton under the career-offender guideline. Our conclusion makes it unnecessary to reach the parties' harmless error arguments.

### III. Conclusion

For the foregoing reasons, Capelton's sentence is affirmed.

**Affirmed.**

-23-